712 P.2d 621

**Randy POSS, Claimant-Appellant,**

**v.**

**MEEKER MACHINE SHOP, Employer,**

**and**

**Argonaut-Northwest Insurance Company, Surety, Defendants-Respondents.**

**No. 15811.**

Supreme Court of Idaho.

Dec. 24, 1985.

Steven C. Verby, Esq., of Grudem, Verby, Elsaesser & Jarzabek, Sandpoint, for claimant-appellant.

John W. Barrett, of Moffatt, Thomas, Barrett & Blanton Chartered, Boise, for defendants-respondents.

Jon M. Steele, and Lynn M. Luker, Boise, for amicus curiae, Idaho Trial Lawyers Ass'n.

DONALDSON, Chief Justice.

On March 11, 1982, appellant, Randy Poss, was working for his employer when a piece of sheet iron weighing between 300 and 400 pounds fell on his back. He sustained injury to his back, neck and shoulders. He was treated by Dr. Frank Cipriano, an orthopedic surgeon in Sandpoint, Idaho.

Poss returned to work in May of 1982, but since he was unable to move or lift heavy objects, he left work in July and was placed on temporary total disability.

Dr. Cipriano referred Poss to a neurosurgeon in Spokane. Thoracic outlet syndrome was diagnosed and Poss underwent surgery on October 5, 1982. The surgery involved removal of a portion of Poss's left first rib.

Poss continued to have considerable pain in his spine and was prescribed pain medication by Dr. Cipriano. Poss was also referred to a physical therapist, Steven Heinrich, who treated Poss from October 21, 1982 through June 1, 1983. Dr. Cipriano has diagnosed Poss's condition as a chronic strain syndrome. Although there is little objective evidence to explain Poss's continued complaints of severe back pain, Dr. Cipriano has noted some muscle spasms in Poss's back and mild scoliosis or curvature in Poss's thoracic spine. It is uncertain whether this is specifically attributable to Poss's injury. Dr. Cipriano rated Poss's permanent physical impairment at between 25% and 30% of the whole man.

On February 7, 1983, at the request of the employer's insurance company, respondent, Argonaut-Northwest Insurance Company (Argonaut), Poss was examined by a panel of three Spokane doctors. The panel rated Poss's impairment as 6% of the whole man secondary to the thoracic outlet sur-

gery, and 5% of the whole man for the dorsal spine injury. The panel concluded that because of the limitation on his activities Poss could not return to the same line of work, but he could engage in other lines of work. The psychiatrist on the panel found no psychiatric problems.

On December 20, 1983, a second panel of doctors from Spokane examined Poss. It made no changes in Poss's impairment rating and noted very few objective manifestations of Poss's pain. The panel also found Poss's condition was stable and further treatment was unnecessary. The panel found that physical therapy could not provide any cure for Poss's chronic condition. Dr. Luther, a member of the second panel, testified that any tenderness in Poss's spine was probably not connected with such an old injury.

Poss is limited in his activities at home and on his farm in that he cannot lift or pull heavy objects. His personality has changed somewhat since the injury and he has lost about 35 pounds. He has difficulty riding in motor vehicles, particularly on the rough country road to his house.

Argonaut ceased paying for any of Poss's medical expenses after the first panel examination on February 7, 1983. On September 13, 1983, Poss filed a petition for an emergency hearing before the Industrial Commission requesting that Argonaut pay his outstanding medical bills, primarily for pain medication and physical therapy. Poss also requested an order directing Argonaut to cover all future medical bills. The petition for an emergency hearing was denied.

On October 12, 1983, Argonaut notified the providers of Poss's medical services of its decision to stop paying Poss's bills, but did pay all bills incurred up to that date. Poss incurred bills of $171.80 between October 12 and December 20, 1983, the date of the second panel's examination. Poss has incurred further expenses for medical services since that date.

On February 27, 1984, the Industrial Commission heard Poss's case. Poss and four of his witnesses were present in person, and all other evidence, primarily the medical testimony, was presented through deposition and other documents. The commission issued its Findings of Fact and Conclusions of Law on October 31, 1984.

The commission stated that in this case it was inclined to give greater weight to the recommendations of the medical panels which examined Poss, than to Dr. Cipriano, Poss's treating physician, since he may be biased by his feelings towards his patient. The commission found little in the way of objective evidence to explain Poss's complaints of chronic pain, and adopted the panels' finding that Poss has a permanent physical impairment of 11% of the whole man caused by the accident.

The commission found there were a number of jobs within a 50-mile radius available at the time which Poss could perform. These included retail sales and certain service work. Poss would suffer some wage loss at first, since he had been making $6 an hour when the accident occurred, as well as some limitations based on his subjective complaints of pain and his inability to drive long distances. Therefore, the commission awarded Poss an additional 15% of the whole man as a permanent disability award for these nonmedical factors.

The commission concluded that Poss did not require any further medical treatment, rejecting Dr. Cipriano's recommendation for continuing pain medication. It did, however, award Poss expenses for medical services rendered up until December 20, 1983, the date of the second panel examination (a total of $171.80).

Based on Poss's permanent partial disability of 26% of the whole man, the commission awarded Poss $133.10 per week for 130 weeks commencing from February 17, 1983. Although Poss was awarded $171.80 for medical expenses incurred prior to the date of the second panel's examination, the commission found Argonaut had not acted unreasonably in terminating or delaying payment of medical bills upon receipt of the first medical panel's evaluation. Poss,

therefore, was not entitled to attorney fees under I.C. § 72–806.

## I.

[1] Poss first argues that since most of the evidence, including all of the medical testimony, before the Industrial Commission was presented by written record rather than through personal appearances, this Court is not bound by the fact findings of the commission. Hence, Poss argues, this Court can review the facts and reach its own conclusion with respect to an impairment rating. Poss cites *Graves v. American Smelting & Refining Co.*, 87 Idaho 451, 394 P.2d 290 (1964) for this purpose.

Poss's citation is correct, however, that rule has long since been abandoned by this Court. Most recently in *Nigherbon v. Ralph E. Feller Trucking, Inc.*, 109 Idaho 233, 706 P.2d 1344 (1985) we held that "[r]egardless of whether witnesses have personally appeared before the Industrial Commission, this Court's review is restricted to determining whether findings of fact by the Industrial Commission are supported by substantial competent evidence." *Id.* at 234, 706 P.2d at 1345; *Horner v. Ponderosa Pine Logging*, 107 Idaho 1111, 1113–14, 695 P.2d 1250, 1252–53 (1985); *Mager v. Garrett Freightlines, Inc.*, 100 Idaho 469, 471, 600 P.2d 773, 775 (1979); *Booth v. City of Burley*, 99 Idaho 229, 580 P.2d 75 (1978); *Gradwohl v. J.R. Simplot Co.*, 96 Idaho 655, 534 P.2d 775 (1975). We stated in *Booth*, in fact, that decisions suggesting a contrary result, such as Poss argues in the present case, were overruled. *Booth, supra*, at 232, 580 P.2d at 78.

## II.

Poss next argues that the Industrial Commission erred by not taking into consideration the subjective factors of pain and Poss's unique living conditions and lifestyle when it arrived at its permanent impairment evaluation. He claims in particular that the panel of Spokane doctors misinterpreted Idaho Worker's Compensation Law, specifically I.C. § 72–424, when it ex-cluded from its evaluation these subjective factors. The commission's conclusions, Poss argues, were, therefore, tainted by the medical panels' erroneous assumptions.

■ We agree that I.C. § 72–424, which must be read in conjunction with I.C. § 72–422, clearly suggests that such factors should be taken into account in arriving at a permanent impairment evaluation. The employee cannot be evaluated in objective isolation since the rating must accurately reflect how this particular employee has been affected in his ability to conduct his customary lifestyle. However, we find no merit in Poss's argument that the panel of doctors completely misinterpreted Idaho law, and therefore, their recommendation tainted the commission's conclusion. The testimony of Dr. Luther, who was on the first panel of examining physicians, clearly indicates that the panel did take into consideration Poss's subjective complaints of pain. In his deposition, when asked about the permanent physical impairment, Dr. Luther said,

"Well, it is not strictly impairment. It is supposed to be strictly impairment but we take in subjective things which we feel belong in it. We don't take other factors that you do when you are talking about disability, such as education, age, training. We don't take those things. We take the subjective complaints."

It is also clear from the record that Dr. Luther and his fellow doctors on the panel relied on the same American Medical Association guidelines that an Idaho doctor would have relied on in arriving at an impairment evaluation. Those guidelines include the consideration of subjective factors such as complaints of pain.

■ It is clear from the record that the commission also independently considered these subjective and nonmedical factors when it added a permanent disability award to Poss's impairment rating. The commission stated:

"In addition to the Claimant's permanent impairment from a medical standpoint, the Commission concludes that some

nonmedical factors need to be taken into consideration. The Claimant does experience some difficulty in accomplishing travel from his home to Sandpoint and Bonners Ferry and has subjective complaints of pain which tend to restrict his activities. However, the Claimant has a number of skills which lend themselves to employment in his labor market area. Considering all of the evidence, the Commission will award the Claimant an additional 15% of the whole man as a permanent disability award for nonmedical factors over and above the rating of 11% of the whole man for medical impairment as determined by the panel examinations."

There was substantial and competent evidence to support the commission's findings on this issue which we refuse to disturb on appeal.

Although the commission did consider Poss's complaints of ongoing pain in its evaluation, it found that by December 20, 1983, Poss's condition was stable. Therefore, the commission found there was no need for additional compensation for pain medication and physical therapy after December 20, 1983, over and above the compensation Poss would receive under his impairment rating and disability award. The commission's findings are supported by the medical examinations of the two panels of Spokane doctors which found no change in Poss's condition between the two examinations. The panels noted as well that the physical therapy Poss had been receiving was only useful in the early stages of the injury.

 The commission did not automatically exclude compensation for any medication or treatment because it was only palliative and of little curative value. In fact, the commission has found the employer's surety is liable for all such medication and treatment rendered prior to December 20, 1983. Pain-killing treatments can be compensable even though they will not necessarily cure the employee's condition. *Hamilton v. Boise Cascade Corp.*, 84 Idaho 209, 215–16, 370 P.2d 191, 194 (1962).

In this case, however, because of the stability of Poss's condition and the lack of substantive evidence of Poss's continued complaints of pain subsequent to the second panel's evaluation, the commission found that additional medication and therapy would be unnecessary. The commission's denial of additional medical benefits for pain medication and physical therapy incurred after December 20, 1983, is supported by substantial and competent evidence.

III.

With respect to the specific evidence in this case, the Industrial Commission noted that it was inclined to give greater weight to the report and testimony of the panel of doctors which examined Poss than to the testimony of Poss's treating physician, Dr. Cipriano. The commission found these panels, consisting of entirely separate groups of physicians, were quite consistent in their findings although the examinations occurred several months apart.

Poss and the Idaho Trial Lawyers Association (ITLA), which filed an amicus curiae brief in this case, argue that the commission is making a basic departure from the rule that the reports of the physicians who treat an injured employee should be given at least as great, if not greater weight, than those of the physicians who examine the employee on only one occasion. *Graves v. American Smelting & Refining Co.*, 87 Idaho 451, 456, 394 P.2d 290, 293–94 (1964); *Stralovich v. Sunshine Mining Co.*, 68 Idaho 524, 533, 201 P.2d 106, 111 (1948).

 It is obvious that both parties in a civil case involving an injured claimant or plaintiff have a legitimate interest in acquiring the medical diagnoses and opinions of doctors of their own choosing. Because of the medical aspects of worker's compensation cases, the Industrial Commission must rely on the knowledge of medical experts, and its findings must be supported by medical testimony. *Comish v. J.R. Simplot Fertilizer Co.*, 86 Idaho 79, 86, 383 P.2d 333, 337–38 (1963). It would be an improper invasion into the fact finding

discretion of the Industrial Commission for this Court to hold that the commission must always give greater weight to one party's medical experts over the other. It would also be improper for the commission to follow a self-imposed rule to that effect.

It would not be unusual for a medical expert to have a bias in favor of the party who is paying his expert witness fee. For this reason, cross-examination as to who is paying for the expert is almost always allowed when the expert is testifying. In cases before the Industrial Commission, the commissioners have no illusions as to who is paying the various medical experts, and whether the expert is appearing before the commission in person or through deposition is irrelevant to whether he may or may not be biased. It would be error for the commission · to adopt a general rule applicable to all cases that it will give greater weight to the testimony of the examining physicians retained by the employer or his surety over the testimony of the employee's treating physician. Such a rule would unnecessarily restrict the fact-finding function of the commission.

In this case, we do not believe the commission has adopted such a rule. Because of the substance and consistency of the two panels' evaluations and the perceived bias on the part of Poss's treating physician, the commission, in its discretion, found the former to be of greater weight than the latter. In the next case, the commission may find quite the opposite.

In fact, we would agree with Poss and the ITLA that in many cases the commission should give greater weight to the testimony of the employee's treating physician since he or she would have a much better opportunity to become acquainted with the claimant and the nature of the claimant's problem. This is exactly what the commission did in the recent cases of Stephens v. U.P.S., 83 IWCD 28 (April 8, 1983) and Bybee v. Lamb-Weston, 84 IWCD 31 (March 28, 1984). The opportunity to observe the patient over a period of time on a regular basis is an important factor, but not the only factor, to be considered in determining the weight which should be given to expert medical testimony. *See Zipp v. Seattle School Dist. No. 1*, 36 Wash.App. 598, 676 P.2d 538 (1984). However, it would again be error for the commission to adopt a general rule applicable to all cases that it will give greater weight to the testimony of treating physicians retained by the employee over the testimony of the employer's examining physicians. Such a rule would unnecessarily restrict the fact-finding function of the commission.

In evaluating the medical evidence in a given case, the commission must consider many factors such as those noted above. Which factors should be given greater weight is within the discretion of the commission. Absent evidence of abuse of discretion in weighing the evidence and so long as the commission's findings are supported by substantial and competent evidence, we will not disturb those findings on appeal.

## IV.

■ Poss finally argues that Argonaut acted unreasonably when it stopped payment of Poss's medical expenses following the first panel's examination. Therefore, Poss argues, he is entitled to an award of attorney fees under I.C. § 72–804. Poss claims that the unreasonableness of Argonaut's conduct is found in their failure to give notice within 15 days to Poss or his physician that payment of Poss's medical expenses were being terminated. Such notice is required under I.C. § 72–806.

It is apparent from the record that Argonaut did, in fact, notify Dr. Cipriano when it forwarded to him a copy of the first medical panel's report which contained that panel's recommendations. Furthermore, by paying Poss's medical expenses up to October 12, 1983, Argonaut did not, thereby, admit liability for unreasonable conduct. The commission stated,

"The Commission concludes that the Claimant has failed to establish that the Surety acted unreasonably in terminating the payment of medical benefits to the Claimant upon receipt of the medical

panel evaluation. The Commission recognizes that there is some uncertainty and doubt as to the responsibility of the Surety for such benefits in the period between the two medical panel evaluations and has given the Claimant the benefit of the doubt in this matter. However, the necessity of continued medication and physical therapy during this period is sufficiently uncertain that the Commission cannot find that the Surety unreasonably denied or delayed payment of such benefits. Therefore, the Claimant is not entitled to an award of attorney fees pursuant to Section 72–806, IDAHO CODE.

In light of the foregoing discussion, the conclusion of the Industrial Commission that Argonaut acted reasonably is supported by the record and will not be disturbed on appeal. Attorney fees are not granted to a claimant as a matter of right under Idaho's worker's compensation laws, but must be recovered only under the circumstances set forth in I.C. § 72–804. The decision that grounds exist for awarding a claimant attorney fees is a factual determination which rests with the commission. *Troutner v. Traffic Control Co.*, 97 Idaho 525, 528, 547 P.2d 1130, 1133 (1976).

The findings of fact, conclusions of law and award of compensation by the Industrial Commission are affirmed.

Costs to respondent.

No attorney fees on appeal.

SHEPARD, BAKES and HUNTLEY, JJ., concur.

BISTLINE, Justice, dissenting.

I.

Part I of the majority's opinion cursorily reaffirms that part of *Booth v. City of Burley*, 99 Idaho 229, 580 P.2d 75 (1979) where this Court held that its power to review the testimony of individuals in Industrial Commission cases would be limited to determining if the Commission's conclusions are supported by substantial and competent evidence, "regardless of wheth-er witnesses have personally appeared before the Industrial Commission." My review of *Booth* reveals that that rule was an accident which should not have happened. It is my fear that four members of the Court placed misguided reliance on the author of *Booth*. I believe that *Booth*'s rule should be overruled. Involving a *pro se* claimant, the case presented a prime opportunity for quietly working a drastic and wholly unjustifiable change in the law.

In order to reach its conclusions, the Court in *Booth* necessarily had to overrule *Phipps v. Boise Street Car Co.*, 61 Idaho 740, 107 P.2d 148 (1940), which in almost forty years had never been questioned by any claimants, the Employment Security Agency, the Department of Employment, or any employers. And, for darn certain, neither party in *Booth* requested, suggested, implied or intimated that an overruling of *Phipps* was in order. This I say with the *Booth* record on appeal before me.

In *Booth* the claimant was *pro se*, and wrote his own brief. The Department was represented by its counsel, and the City of Burley had counsel—both filing briefs in support of the senior appeals examiner for the Department, who awarded benefits to Mr. Booth. The Department, satisfied with the examiner's decision, did not seek review by the Commission—only the employer did so. The Commission reviewed only the cold record sent to it from the Department. With one commissioner not signing the decision, the Commission reversed the decision of the senior appeals examiner, Booth in turn brought his claim to this Court.

My purpose here is not to point out that *Booth* was wrongly and poorly decided. That was done in my dissent to *Booth*. *See Booth, supra,* 99 Idaho at 233–34, 580 P.2d at 79–80 (Bistline, J., dissenting). What I do here is further delve into *Booth* insofar as it overruled *Phipps*. The applicable part of *Booth* reads as follows:

[S]everal prior decisions of this court have held that findings of fact by the Industrial Commission are not binding on appeal when the Commission does not

hear and see witnesses. In these cases, the court has suggested that it will independently review the record to determine whether a claimant is eligible for benefits under the Employment Security Law. *Clay v. Crooks Industries,* 96 Idaho 378, 529 P.2d 774 (1974); *Mata v. Broadmore Homes,* 95 Idaho 873, 522 P.2d 586 (1974); *Kirkbride v. Department of Employment,* 91 Idaho 658, 429 P.2d 390 (1967); *Custom Meat Packing Co. v. Martin,* 85 Idaho 374, 379 P.2d 664 (1963); *Wolfgram v. Employment Sec. Agency,* 75 Idaho 389, 272 P.2d 699 (1954); *Mandes v. Employment Sec. Agency,* 74 Idaho 23, 255 P.2d 1049 91953); *Phipps v. Boise Street Car Co.,* 61 Idaho 740, 107 P.2d 148 (1940).

The justification ·for this expanded scope of appellate review has been based on the theory that, "When the trier or triers of facts does not or do not hear and see the witnesses face to face, the findings of such tribunal are not necessarily and *ipso facto* of any greater cogency than those of any other tribunal." *Phipps v. Boise Street Car Co.,* 61 Idaho at 747, 107 P.2d at 51. However, since this court's adoption of an expanded scope of review in *Phipps v. Boise Street Car Co., supra,* the Idaho Employment Security Law has been extensively amended to provide an initial determination of eligibility for unemployment benefits, four levels of agency review and judicial review by this court. I.C. § 72–1368; *Department of Employment v. St. Alphonsus Hospital,* 96 Idaho 470, 531 P.2d 232 (1975). These statutes, together with the inappropriateness of judicial review of questions of fact, militate against assuming an expanded scope of appellate review in unemployment compensation cases involving factual disputes, regardless of whether witnesses have personally appeared before the Industrial Commission. The court therefore declines to independently adopt findings of fact at variance with those of the Industrial Commission where such findings are supported by substantial and competent evidence in the record. Prior

decisions suggesting a contrary result are, to this extent, hereby expressly overruled. *Id.* at 232, 580 P.2d at 78.

It is to be *carefully* noted that the *Booth* author suggested to us that *Phipps* was responsible "for this expanded scope of appellate review." Not so at all. *Phipps* itself teaches otherwise:

Beginning with *Roby v. Roby,* 10 Ida. 139, 77 Pac. 213, this court held and has consistently adhered to the holding that:

"Since the trial judge did not see the witnesses upon the stand [the case having been referred to a referee to take testimony and report it to the court] and did not hear them testify but determined the case on depositions, we are in as favorable a position to judge of their truthfulness and the weight to be given to the evidence as was the trial judge. In such case the rule that this court will not disturb the judgment where there is a conflict in the evidence does not apply." See, also, *Stoneburner v. Stoneburner,* 11 Ida. 603, 83 Pac. 938; *Spoffard v. Spoffard,* 18 Ida. 15, 108 Pac. 1054; *Parsons v. Wrble,* 19 Ida. 619, 115 Pac. 8, 13; *Jackson v. Cowan,* 33 Ida 525, 196 Pac. 2165; *McKenzie v. Miller,* 35 Ida. 354, 206 Pac. 505; *In re Rexburg Investment Co.,* 36 Ida. 552, 211 Pac. 552; *Estate of Peterson,* 38 Ida. 195, 220 Pac. 1086; *Estate of Tormey,* 44 Ida. 299, 256 Pac. 535; *Pioneer Irr. Dist. v. American Ditch Assn.,* 50 Ida. 732, 1 Pac. (2d) 196; *Keyes v. Keyes,* 51 Ida. 670, 9 Pac. (2d) 804; *Cannon v. Seyboldt,* 55 Ida. 796, 48 Pac. (2d) 406, all decided prior to the adoption of the constitutional amendment, *supra. Phipps, supra,* 61 Idaho at 747, 107 P.2d at 150.

The constitutional amendment the *Phipps* Court mentioned was the amendment ratified in the general election of 1936 which added to art. 5, § 9, the provision that "On appeal from orders of the industrial accident board the court shall be limited to a review of questions of law." The *Phipps* Court was well aware of that amendment and placed it directly in the opinion, 61 Idaho at 746, 107 P.2d at 150. The Court

then proceeded with its interpretation of the amendment:

The general principles of statutory construction apply to the interpretation of constitutions. (16 C.J.S., Constitutional Law, secs. 15–29; 12 C.J.S. 699–710, sec. 63.) It is therefore to be assumed the legislature, in presenting, and the people, in adopting, the amendment were familiar with the holdings above referred to and uniformly followed. (*Oregon Short Line R. Co. v. Pfost*, 53 Ida. 559, 576, 27 Pac. (2d) 877.) We must presume the amendment contemplated the law as it had been announced by this court. *Wright v. Callahan*, 61 Idaho 167, 99 Pac. (2d) 961.

When the trier or triers of facts does not or do not hear and see the witnesses face to face, the findings of such tribunal are not necessarily and *ipso facto* of any greater cogency than those of any other tribunal. Moreover, where the reason of the law ceases, the law itself also ceases.

(*Beardsley v. City of Hartford*, 50 Conn. 529, 47 Am. Rep. 677; *Succession of Baker*, 129 La. 74, 55 So. 714, 719, Ann. Cas. 1912D, 1181; *Moore v. Sharpe*, 91 Ark. 407, 121 S.W. 341, 23 L.R.A., N.S., 937; *People v. Bloom*, 193 N.Y. 1, 85 N.E. 824, 826, 127 Am.St. 931, 936, 15 Ann.Cas. 932, 934, 18 L.R.A., N.S., 898, 901; 6 Words and Phrases 472.)

Furthermore, are we to assume that the amendment was intended to give greater sanctity to the findings of the Industrial Accident Board than to the findings of a district judge, based only on written testimony, not evidence given *ore tenus?* Such has not been historically the apparent theory of law. (Secs. 30–1109, 61–1910, 11–303, 11–406, I.C.A.) We conclude that no greater weight should be given to findings of the Industrial Accident Board than to those of a district court. Hence, unless the board or a majority thereof hears and sees the witness testify (the procedure fixed by the Workmen's Compensation Law), *its findings are not, even under the constitutional amendment*, in view of the above holdings of the court, *conclusive on this court nor so intended to be by the people. Phipps, supra,* 61 Idaho at 746–48, 107 P.2d at 150–51.

What *did not* appear in the *Booth* opinion was that the primary issue in *Phipps* was of constitutional magnitude, and the decision was reached by a unanimous Court. What *did* appear in *Booth* was one bare, isolated sentence from *Phipps* found buried in a sentence which did not disclose its constitutional backbone:

The justification for this expanded scope of appellate review has been based *on the theory* that "When the trier or triers of fact does not or do not hear and see the witnesses face to face, the findings of such tribunal are not necessarily and *ipso facto* of any greater cogency than those of any other tribunal." *Phipps v. Boise Street Care Co.,* 61 Idaho at 747, 107 P.2d at 51. *Booth, supra,* 99 Idaho at 232, 580 P.2d at 78. (Emphasis added.)

There is a world of monumental difference between an abstract theory on the one hand, and a constitutional decision on the other.

Since the author of the *Booth* opinion placed in the proffered opinion for the Court only the one quoted sentence out of *Phipps*, it may be safely assumed that the other members of the Court also believed as did I that *Phipps* was but a theory, and that it did initiate the doctrine of expanded scope of appellate review. In this business, as a general proposition, at that time it was my belief that the members of this Court have as much right to rely upon the fairness and accuracy of quotations by the justice assigned the writing of a given case as we do in relying upon those in briefs of counsel. At no time was there ever any thought that in *Booth* the Court was gratuitously overruling a prior constitutional decision. Accordingly, I submit that the very least *Booth* should be reconsidered. If it is to overrule *Phipps*, it should be properly done, and with the benefit of briefs from counsel. At the best, however, *Booth* should be overruled by reason of inadvertence in overruling *Phipps*, and I submit

why. First, because *Booth* should not have so lightly overruled that which our predecessors on the Court did forty years ago—unless exigent cause was shown for doing so, and unless the Court was being asked to do so—neither of which reason existed. Second, the *Phipps* Court was a respected Court. In addition to Justice Holden, Justice Ailshie, who in the view of many was Idaho's most able jurist, was on that Court, along with Justice Givens, Justice Budge and Justice Morgan, the latter not participating because his son-in-law, and later a justice, E.B. Smith, represented the claimant. It was a Court of stature, and it was a Court which dealt liberally, as the statement of purpose of this then novel social legislation directed.

The reasoning of the *Phipps* Court was sound. I can conceive of no reason, none whatsoever, for the overruling of that which the *Phipps* Court held—which was entirely in consonance with all precepts of Idaho law. I see every reason for continued adherence.

The real holding of the *Phipps* Court was not to expand the scope of this Court's review on a cold record—*but to continue it* in light of the 1935 amendment to art. 5, § 9 of the Idaho Constitution. The basis for the decision to continue it was clearly set out in *Phipps,* and in language familiar to this court even as presently constituted: "We must presume the [1935] amendment contemplated the law as it had been announced by this Court." *Phipps, supra,* 61 Idaho at 747, 107 P.2d at 150.

Today, except for *Booth,* this Court on a cold record would properly decide for itself whether the claimant is entitled to prevail. Instead, and of course by far the easier route, the majority avoids any effort on its own part because *Booth* says we must not.

Whatever motivated the author of *Booth* to treat *Phipps* as was done is beyond me, and I would prefer to believe it was an inadvertence occasioned by relying on an inexperienced law clerk. No matter. The issue I present to the other members of the Court is simply stated. On being confronted with the proposition that an earlier and able Court held that the 1936 amendment did not preclude our independent examination of a cold record, are three members of the Court ready to say that they now *knowingly* are prepared to overrule the prior constitutional decision made by the *Phipps* Court? And are they willing to do it also full well knowing that the *Phipps* holding ennured to the benefit of the working person?

## II.

Part II of the majority's opinion finds "no merit in Poss's argument that the panel of doctors completely misinterpreted Idaho law." P. 624. This "finding" by the majority is certainly a novel one, for the record does not sustain it.

What the record does show is the following: First, each member of the panel of doctors who evaluated Poss lives in Spokane, Washington, where they are licensed to practice. None of them are licensed to practice medicine in Idaho. Second, what the panel thought constituted an impairment evaluation is at odds with Idaho law. Dr. Luther, speaking for the panel, defined such an evaluation as follows:

Question—With regard to this concept that we have talked about involving a permanent partial impairment, Dr. Luther, in your opinion, and you have rendered an opinion as to what permanent partial impairment could be assigned to Mr. Poss, what is your understanding of the definition of a permanent partial impairment as it relates to injured working people in the state of Idaho?

Answer *Well, I feel that any physical impairment, Idaho or anywhere else, is a certain amount of loss of function of that part compared to whatever percentage we recommend.*

Q. *Is that your understanding of what the permanent physical impairment, or partial impairment is as it relates to injured working persons in the state of Washington also?*

A. Certainly.

Q. *So, your impairment rating, or evaluation, is based upon the loss of function to that particular part of the body?*

A. *Yes.*

Q. And that was the basis for you making the report, the panel making the report that it did?

A. That is correct. (Emphasis added.)

This concept of a permanent impairment evaluation can be equated to a loss of range of motion concept—a concept that is dissimilar to the Idaho definition of a permanent impairment evaluation. Rather than being a loss of function or loss of range of motion, a permanent impairment evaluation in Idaho is defined as follows by I.C. § 72–424:

Evaluation (Rating) of Permanent Impairment" is a medical appraisal of the nature and extent of the injury or disease *as it affects an injured employee's personal efficiency in the activities of daily living, such as self care, communication, normal living postures, ambulation, elevation, traveling, and nonspecialized activities of bodily members.* (Emphasis added.)

Mr. Poss's treating physician, Dr. Cipriano, defined a permanent impairment evaluation in a manner consistent with Idaho law:

I consider the patient's pain and lack of function primarily. I try to be guided by recommendations in the AMA Guide to evaluation to permanent impairment and take into consideration the activities of daily living that the patient is no longer capable of performing.

Dr. Cipriano further defined how he rates the person's disability:

Well, I used the AMA Guide as my background and the Orthopaedic Guide to Permanent Evaluation both and it is *to consider the impact of a patient's symptoms* on the way he can function in activities of daily living and job-related activities. (Emphasis added.)

Compare this statement with Dr. Luther's methods:

We use [the] *Washington Guide,* we use the MA Guide, and we use the Academy of Orthopaedic Surgeons Guide. (Emphasis added.)

Dr. Luther has failed to demonstrate a fundamental knowledge of what constitutes an impairment evaluation for purposes of Idaho law. Dr. Cipriano, however, displayed a correct understanding of the law. The Industrial Commission should not, therefore, embrace Luther's panel's impairment rating and reject the treating physician's.

I find it inexplicable how the majority, as a matter of law, can adopt the findings of this impairment evaluation prepared by a board of Spokane-based doctors, when such a panel abjectly demonstrates no concept of what a permanent impairment evaluation is in the state of Idaho.

III.

Part III of the majority's opinion implicitly overrules the longstanding rule in Idaho that "[r]eports of the physician who treats the injured person should be given at least as great if not greater weight, than those of a physician who examined the claimant only prior to trial." *Graves v. American Smelting & Refining Co.,* 87 Idaho 451, 456, 394 P.2d 190 (1964); *Stralovich v. Sunshine Mining Co.,* 68 Idaho 524, 533, 201 P.2d 106 (1948); *see also Jensen v. Wheeler & England,* 51 Idaho 91, 94, 1 P.2d 624 (1931); *Delich v. Lafferty Shingle Mill Co.,* 49 Idaho 552, 556, 290 P. 204 (1930); *Hawkins v. Bonner County,* 46 Idaho 739, 742, 271 P. 327 (1928).[1] I consider this to be unwise and unsupportable.

Even the Industrial Commission in the past has adhered to the *Graves* rule. In *Stephens v. United Parcel Service,* 83 I.W.

---

1. Washington has a similar rule, which is as equally time-tested as ours. *Zipp v. Seattle School Dist. No. 1,* 36 Wash.App. 598, 676 P.2d 538, 542 (1984); *Chalmers v. Department of Labor and Industry,* 72 Wash.2d 595, 434 P.2d 720 (1967); *Spalding v. Department of Labor and Industry,* 29 Wash.2d 115, 186 P.2d 76 (1947).

C.D. 28 (April 8, 1983), the Commission stated as follows:

> The psychiatric testimony in this case is directly in conflict. The Commission finds that Dr. Cone has had a much greater opportunity to reach an accurate diagnosis because he has treated the Claimant on a regular basis since March of 1981, while Dr. Lawless had an opportunity to observe the Claimant on only one occasion for approximately two and one-half hours. *Dr. Cone has obviously had a much greater opportunity to become acquainted with the Claimant, to observe him, to understand the nature of his problem, and to form a reliable opinion as to whether the Claimant is disabled from work and the cause of such disablement.* The testimony of Dr. Lawless was carefully and thoroughly presented and her opinions are supported by references to statements made by the Claimant or to items taken from his history. However, it is clear that this is an area in which qualified experts may arrive at different opinions and, *in such cases, the Commission believes that the opportunity of the witness to observe the patient over a period of time on a regular basis is the more important factor to be considered in determining the weight which should be placed upon the expert testimony.* The Commission finds that the testimony and opinion of Dr. Cone is entitled to greater weight in this case. Accordingly, the Commission resolves the conflict in the expert opinions in favor of the Claimant. (Emphasis added.)

In *Bybee v. Lamb-Weston,* 84 I.W.C.D. (March 28, 1984), a conflict of opinion existed between the treating physician, Dr. Schossberger, and the two physicians (Drs. Henson and Tregoning) hired by the insurance company to evaluate the claimant. The Commission adopted the referee's finding, which was a correct statement of the law. The referee said: "The Referee finds that Dr. Schossberger, as the treating physician, has had the best opportunity to observe the Claimant and to rate the Claimant's permanent physical impairment."

The majority opinion even today acknowledges the validity of the rule. P. 626. Inexplicably, however, the majority declares that the *Graves* rule should not be a "general rule applicable to all cases...." *Id.* The majority fails, however, to state when the rule is applicable. If it is not a general rule, and it is unclear when it is a specific rule, then it is no rule. Thus, despite statements to the contrary, the rule is, apparently, in the majority's view, a rule without an application. This is made manifest by the fact that the *reasons* for which the Commission chose to give little weight to Poss's treating physician *directly contradict the reasoning for the rule.* The Commission said:

> In this case, the Commission is inclined to concur in the observation of Dr. Luther that *independent*[2] *examining physicians tend to be more objective in their findings, and that the treating physician may well be biased by his feelings toward the patient.*

Such a statement represents a radical departure from Idaho law declared both by this Court and the Commission. In fact, this statement turns Idaho law on its head.

The familiarity of the treating physician with the injured employee, and his more extensive familiarity with all of the factors involved in an injured worker's case, is now being turned against the injured employee and used to the injured employee's disadvantage with the bald assertion that the familiarity creates bias. Such is certainly unfounded, and far distant from the policies supporting the workmen's compensation law that injured employees are to obtain sure and certain relief. I.C. § 72–201.

Even Dr. Luther, whom the Commission relied upon in making its assertion, later on contradicted himself by conceding that the treating physician is better qualified to testify about a patient than a doctor such as Dr. Luther, who merely sits on a panel:

---

**2.** There is a real question in my mind of how "independent" these examining doctors were when they were all being paid by the insurance company-defendant to examine Mr. Poss.

Q. Dr. Luther, I have, I am sure you are aware, several questions. The first one goes to having seen the treating physician's records, Dr. Cipriano's, and I am referring to his treatment notes that have been marked as an exhibit and will be attached to the deposition. Did you notice in those records there was a recommendation by Dr. Cipriano to continue ongoing physical therapy in the Sandpoint area?

A. Yes, I remember that.

Q. Do you recall during the course of your discussions with Mr. Poss his indication that the physical therapy helped alleviate some of the ongoing pain symptoms that he had?

A. Yes.

Q. *Would you agree with me that the treating physician who is handling the patient might have perhaps better insight as to type of modality of treatment than perhaps a physician who sees a patient on one occasion?*

A. *Yes.*

Q. With regard to Mr. Poss, did you have an opportunity to see him on only one occasion?

A. Yes. (Emphasis added.)

The facts of this case also reveal that Mr. Poss's treating physician was correct in stating that Mr. Poss has a serious pain problem. This is supported by the employer, Mr. Meeker, who is technically a defendant in this matter. His testimony is clear that Mr. Poss had significant problems continuing work because of pain. Tom Davis, Mr. Poss's neighbor, also clearly described the difficulties that Mr. Poss had. Steven Heinrich, Mr. Poss's physical therapist, who saw Mr. Poss regularly, also testified about the chronic pain of which Mr. Poss was suffering. All of this the majority majestically chooses to ignore.

Against all of this background, the only contact that the panel physicians had with Mr. Poss's daily activities was his one brief appearance to submit to their examination.

Dr. Luther, based on this one examination, went so far to say that Mr. Poss could return to his former employment, which Mr. Meeker, the employer, said he definitely could not do. Nor is there anything in the record to support the Commission's adoption of Dr. Luther's bald assertion that evaluating physicians who have seen a patient only once (or even twice) are in a better position to make an assessment than the treating doctor, because of the latter's wholly surmised bias.

I.C. § 72–424 requires that a permanent impairment evaluation be based upon the effects of permanent impairment upon the employee's activities of daily living. Panel physicians often have inadequate bases upon which to apply this most important element. On the contrary, treating physicians, who work with the injured worker on a regular basis, become well qualified in making this type of assessment.

The fact that both panels came to the same conclusion with regard to impairment is not that remarkable. Dr. Luther obviously had a copy of the original panel report from February, 1983. Dr. Luther's opinion was clearly influenced by the prior panel evaluation. He stated:

Q. What is your opinion relative the degree of permanent physical impairment?

A. We felt that his impairment was as had been previously determined in February of 1983.

The majority's ruling today tips the scales in favor of sureties in worker's compensation litigation. Contrary to the impecuniously disadvantaged claimant, the favored surety with its tremendous resources can send the injured employee to as many panels as it desires. If there is a statutory obstacle in the way, I am presently unaware of it. It can also constitute the panels in such manner as is deemed most expedient. Here the surety strangely did not see fit to invite Mr. Poss's treating physician to participate.[3]

**3.** I.C. § 72–433(2) allows the employee the right to have a physician or surgeon present at an

examination designated by the surety or employer, however, the employee is responsible for

This Court should appreciate the disadvantaged position in which this claimant found himself. On the one hand, his treating physician says "you are not stable, you need continuing medical care, and you should not be doing this type of work." The panel, whom the employee has no relationship with, nor likely confidence in, and which may have constituted little more than a group of hired guns, tells him that he can go back to work, and that he doesn't need any medical care (notwithstanding the fact that he is in significant pain). Thus, his benefits are cut off based upon the panel evaluation. Should he go back to work and discontinue medical care in violation of his treating physician's recommendations; or should he continue with his treating physician's advice that he avoid certain types of work while at the same time incurring unrecoverable medical expenses which he has no resources to pay? Today's opinion places the injured employee in a no-win situation—a result that is clearly at odds with the underlying policies of Idaho's worker's compensation law, which is that sure relief for injured workers and their dependents be provided, I.C. § 72–201, and that the laws and rules relating to worker's compensation be construed liberally in favor of claimants. *Hattenburg v. Blanks*, 98 Idaho 485, 567 P.2d 829 (1977); *Jones v. Morrison-Knudsen Co.*, 98 Idaho 458, 464, 567 P.2d 3, 9 (1977); *In re Haynes*, 95 Idaho 492, 496, 511 P.2d 309, 313 (1973); *Smith v. University of Idaho*, 67 Idaho 22, 26, 170 P.2d 404, 406 (1946).

#### IV.

The majority finally refuses to award attorney's fees pursuant to I.C. § 72–804. With a correct resolution of this case, I believe that such an award is manifestly justified. For all the foregoing reasons, I dissent.

the expenses incurred. It will be the rare exception where the injured employee can afford this expense.